UNITED STATES DISTRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW J. LIS,<br><br>Plaintiff,<br><br>-against-<br><br>JASON M. LANCASTER, DEBBIE LANCASTER, CECIL SIMMONS, DEE CHASE-UNNO, GULF PREMIER LOGISTICS, LLC, OVERLAND DISTRIBUTION CO., INC., OVERLAND EXPRESS CO., INC., JAL ENVIRONMENTAL SERVICES PROGRAMS D/B/A JAL ENVIRONMENTAL SERVICES PROGRAMS, INC., BANK OF AMERICA, JP MORGAN CHASE BANK,<br><br>Defendants. | Case No. 1:19-cv-01414 (JSR)<br><br>**DECLARATION OF JASON M. LANCASTER IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

**JASON M. LANCASTER**, declares, under penalty of perjury under the laws of the United States of America, as follows:

1. I am a Defendant in this action. I am also the President, owner, and sole shareholder of Defendant JAL Environmental Services Programs, Inc. ("JAL"). I make this Declaration out of personal knowledge, in opposition to the motion of Plaintiff Andrew Lis ("Mr. Lis") for a preliminary injunction.

2. I have reviewed the Verified Complaint (the "Complaint") in this action as well as the Affidavit of Mr. Lis submitted in support of his motion (the "Lis Aff."). Both the Complaint and the Lis Aff. include a number of blatantly false statements and otherwise tell a fanciful and extraordinarily misleading story about the relationship between Mr. Lis and myself and Mr. Lis and JAL. As set forth herein, the relevant facts demonstrate that Ms. Lis has no entitlement whatsoever to any injunctive relief and indeed no entitlement to any of the relief sought in the

Complaint. Rather than being a part owner of a 50-50 venture with me as Mr. Lis claims, Mr. Lis was a salaried employee hired by me to perform certain duties for the benefit of JAL; his allegations of financial improprieties are false; and, in fact, Mr. Lis took a number of steps, both in the course of our business relationship and thereafter, to undermine JAL and myself and to steal JAL's business. For these and other reasons, he is not entitled to injunctive relief.

*Background*

3. In early January 2016, Mr. Lis and I discussed entering into a venture in the industrial waste business, which would utilize our respective expertise. The planned business would act as an intermediary by purchasing recycled materials from producers in the United States and reselling the products to vendors nationally and overseas. Mr. Lis had experience in sales and marketing of these services while I had expertise in freight forwarding, logistics, and related matters, which would be essential components of this venture.

4. In the course of our discussions regarding a potential business relationship I asked Mr. Lis if he had any non-compete or other conflict that might preclude our pursuit of this opportunity. Mr. Lis stated that he did not and that we could proceed.

5. In light of Mr. Lis' representations to me, I agreed to form a corporation in Texas that would be the vehicle for pursuing this business. Mr. Lis would be responsible for efforts to acquire customers and for invoicing the various projects. All matters from that point forward would be overseen or handled by myself and my staff at Gulf Premier Logistics, Inc. ("Gulf Premier"), which was a freight-forwarding company 100% owned by me. This would include all administrative duties; coordinating transport from our facility to the Port at Houston, booking ocean freight carrier; providing freight forwarding services; and creating legal export documentation for the customers. I would also contract with third-party companies to provide

trucking and warehousing services. I would also oversee the company's finances. Our plan at all times was to work collaboratively in building the business.

6. In addition, I would take responsibility for securing a business loan for JAL. After I formed JAL, I arranged for JAL to receive a business loan of $300,000.00 from my mother, Debbie Lancaster. The purpose of the loan was to provide money for start-up costs associated with the business. A copy of the note evidencing this loan is attached hereto as Exhibit A. Despite Mr. Lis's repeated misrepresentations, this was not a "personal loan" or a "personal matter." On the contrary, this was a loan to JAL, and the note specifically states that the borrower was a "corporation organized under the laws of the State of Texas," i.e. JAL. Indeed, in a proposed "Release" that Mr. Lis presented to me when our relationship was winding down, Mr. Lis indicated that he would be 50% responsible for payment of the loan.

7. Notably, the referenced loan was the only amount ever infused into the company. Despite his claims of being a 50% partner, Mr. Lis never invested any amount of money in JAL.

8. Mr. Lis's employment with Amlon Resources Group, LLC ("Amlon"), a global environmental services company focused on recycling, processing, treatment and management of industrial waste streams, ended on February 1, 2016. Upon the conclusion of that employment, he became an employee of Gulf Premier. Mr. Lis and I agreed that he would be compensated for his services through a salary of $150,000 per year, and that he would also receive health insurance and other benefits. As an employee of Gulf Premier, he would perform services for the benefit of JAL. Copies of Mr. Lis's W-2's are attached as Exhibit B. Because I was the sole owner of the business, I did not take a salary at the outset of this relationship.

9. Subsequent to my formation of JAL, Mr. Lis indicated that he was hesitant to move forward with any business partnership with me. He informed me on several occasions that another company in the hazardous waste recycling space, U.S. Ecology, Inc., had discussed potential employment with him and that he was considering taking that position.

10. In early May 2016, Mr. Lis and I had further discussions about a potential partnership. However, in mid-May, an attorney for Amlon delivered to Gulf Premier a letter stating that Mr. Lis had a non-compete agreement with Amlon and demanding that he cease and desist any activities in violation of that agreement. A copy of that letter is attached as Exhibit C.

11. I confronted Mr. Lis about this non-compete, of which I had not been informed. Mr. Lis told me that he had discussed this with a lawyer friend who believed it was not an issue so he did not feel compelled to reveal it to me. Given the circumstances, we agreed that we could not proceed with any sort of partnership, but that Mr. Lis would continue as an employee of Gulf Premier seeking to source business for ESP, which would remain solely owned by me. We also agreed that he would continue to draw the same $150,000.00 salary we had agreed to and that discussions of any formal partnership would be put off for at least two years.

12. As we moved forward with the business through 2016 and 2017, Mr. Lis's responsibilities continued to be seeking customers and invoicing them for services. Nevertheless, I played a critical role in the development of the business and obtaining sales. This is evident in the attached correspondence, where these customers acknowledge the substantial role I was playing. Exhibit D.

13. Mr. Lis never had any responsibility for ESP's finances, although for much of our relationship he had access to the company's accounts. Those areas were principally my responsibility. Likewise, while he was involved in sales, he never had any authority for entering

into contracts on ESP's behalf. Any contracts needed to be approved by me. At one point in time, Mr. Lis informed me that he kept an informal ledger of the revenue gained from the various projects that he had sourced. Notably, Mr. Lis' ledger did not take into account any expenses of the company. It only tracked revenue. While I am not certain where many of the numbers included in the Lis Aff. came from, some of the "discrepancies" that he seems to believe existed in the books may simply reflect his failure to take into account company expenses.

14. In addition to his $150,000 salary, which he started receiving in 2017, Mr. Lis received certain bonuses. His total compensation for 2017 was $277,000. By contrast, I, the sole owner of JAL, did not take any salary until late 2017. I did however take distributions in early 2017 in the amount of approximately $70,000.00. Because I was the sole owner of the company, this was not "embezzlement," and I did not have any obligation to seek Mr. Lis's approval.

15. In 2017, given the growth of the business, I decided it was best to hire an outside firm to handle the company's finances. I received a recommendation of an accounting firm in Texas that used QuickBooks. I hired that firm which was responsible for keeping the company's books and preparing its tax returns. In his Affidavit, Mr. Lis raises questions about certain of these expenses. Once again, Mr. Lis was not involved in the financial affairs of the company and has no basis for questioning the way expenses were treated. However, the expenses listed on the tax returns – for such items as travel, freight, product sampling – were all calculated by our outside accountant based on its review of the books and records of the company.

*Mr. Lis' Specific Allegations of Wrongdoing are Baseless*

16. In his Affidavit, Mr. Lis makes a number of specific allegations of wrongdoing, including making reference to different sums of money that he claims were somehow "embezzled" or purloined from JAL by me and the other Defendants. While many of these claims of

wrongdoing are redundant, and some almost incomprehensible there is no basis for any claim that I, or any of the other Defendants engaged in financial improprieties or took steps to harm either ESP or Mr. Lis. On the contrary, it is Mr. Lis who caused harm to the business.

17. Mr. Lis contends that I improperly took a $28,816.00 "distribution" without justification. In fact, for 2017, JAL had tax liability of $28,816.00. I paid this amount out of my own pocket. Exhibit E. I thereafter reimbursed myself the $28,816.00. There was nothing illicit or improper about do.

18. Mr. Lis refers to $98,925.83 that he claims that I owed to JAL relating to certain business. This work was for a company called Nickelhuette Aue GmbH ("NHA"). For reasons of NHA's choosing, the company contracted with Gulf Premier, rather than JAL for the services it was seeking, and Gulf Premier invoiced NHA for services provided. Gulf Premier, in turn, would remit the payments it received, less fees for its services, to JAL. As is entirely clear from the email on which Mr. Lis purportedly relies, a substantial portion of the amount paid by JAL to Gulf Premier relating to this work had been transferred to JAL by October 2018. All remaining funds were subsequently transferred. There are no amounts currently due by Gulf Premier to JAL relating to this work. Exhibit F.

19. Mr. Lis also raises issues regarding the cars that I leased and purchased. I did in fact lease and subsequently purchase a car, paid for by JAL, which I used to conduct business on behalf of JAL. Lis Aff. ¶ 53. Again, since I was the sole owner and manager of JAL, there was nothing inappropriate about my doing so. I note as well that at no time did I contact Mr. Lis to request his permission to lease a car.

20. Mr. Lis also suggests that I "removed" $95,965.64 between February 2016 and December 2016. Lis Aff. ¶ 31. I have no knowledge of what he is referring to. I note as well that Mr. Lis provides no support whatsoever for his claim that any such funds were removed from JAL.

21. Mr. Lis also raises supposed concerns regarding an invoice that was issued by a customer, U.S. Ecology, Inc., contending that I improperly delayed payment of this invoice. Lis Aff. ¶ 32. In fact, any delay in payment to U.S. Ecology was a direct result of Mr. Lis's improper conduct. It is my understanding that Mr. Lis, who had had a longtime relationship with U.S. Ecology, went to U.S. Ecology in late 2018 and asked that U.S. Ecology stop shipping product to us which we would in turn sell to our customers. As a result of this, we had shortfalls in payments which in turn made payment of these invoices more difficult. Nevertheless, all U.S. Ecology invoices rendered to JAL have now been paid. And, as discussed below at para 31-32, any purported "payment" by Mr. Lis of invoices from U.S. Ecology was a part of his on effort to usurp JAL's business through the use of a separate entity he created.

22. Mr. Lis claims that I reported $266,622.14 of "fraudulent, non-existent expenses for 2017." Lis Aff. ¶ 23. This is not true. As discussed above in paragraph 15, JAL's returns were prepared by an outside accountant based on its review of the company's books and records, including invoices and receipts.

23. Mr. Lis claims that I "threatened to release defamatory statements and trade secrets to our clients." Lis Aff. ¶ 4. This is not true, and I certainly had no incentive to release "trade secrets" to the detriment of a business I owned. Notably, Mr. Lis fails to identify the "defamatory statements" or "trade secrets" at issue, or the clients involved.

### *The End of Our Business Relationship*

24. In late 2018, my relationship with Mr. Lis became increasingly strained. In September 2018, Mr. Mr. Lis sent me a proposed "Memorandum of Understanding Addendum to Operating Agreement," a copy of which is attached as Exhibit G. The draft purported to set forth the terms under which the JAL business would operate in the future. Notably, the proposed agreement acknowledged that "no formal agreement has governed the parties' relationship," although it otherwise contained terms that were not accurate or agreeable to me. I declined Mr. Lis's request that I sign the agreement and was particularly perturbed that he would present an agreement for me to sign (which was apparently prepared by a lawyer at his request) without consultation or allowing me any input. No other agreement of any kind purportedly governing the terms of our relationship was ever put in place.

25. By October 2018, my relationship with Mr. Lis had grown very contentious. Mr. Lis on several occasions insinuated that I was a "thief" and that I was involved in various wrongdoing, claims that I vehemently denied and, in fact, did not understand. In addition, it became apparent to me that Mr. Lis was making similar allegations to various suppliers and customers, hurting my relationships and undermining JAL. I confronted Mr. Lis about his accusations and also questioned him about his future direction. At that time, Mr. Lis made clear that it was his intention to leave his employment. He also made clear to me that he wanted to continue with the business that I had financed and built but without my involvement. Given Mr. Lis's indication that he did not wish to continue in his employment but rather intended to be a competitor, I chose to cut off Mr. Lis's access to any of the company's financial records. I did, however, leave in place his access to email, which would enable Mr. Lis to complete any work he had to do on the sales side before his departure.

26. Subsequent to these discussions, my mother Debbie Lancaster, who had provided the business loan and who was still owed a substantial amount by JAL, suggested that all parties meet to see if there was any way of resolving our differences. To that end, we had a meeting in Houston, Texas on late October 29, 2018, at which we discussed a way forward.

27. At the meeting, Mr. Lis again berated me, and the company, making a number of accusations that were unfounded and unfair. He also made very clear that he had no desire to continue in our employment. On the contrary, Mr. Lis suggested at that point in time that myself and my mother simply abandon the business, which he would then "take over." Mr. Lis presented a proposed "Release" whereby he would take charge of JAL during its wind-down and pursuant to which he would have the right to continue to service the business that had been developed for JAL. A copy of the Release is attached as Exhibit H. Despite Mr. Lis's claims in his Affidavit, I never agreed to cede control of the accounting or other functions of JAL to him.

28. Given the circumstances, I saw absolutely no reason to continue with the relationship with Mr. Lis. Thereafter, Debbie Lancaster called the note on the loan she had given to JAL, as was her right under the loan documents and subsequently she was paid back. Mr. Lis made clear that he agreed that the loan should be paid back. Exhibit I. Again, despite his repeated claim that this was a "personal loan" to me, in his proposed Release, he suggested that he should be 50% responsible for its repayment, given his claim to be a 50% owner of the business.

29. Mr. Lis's employment with Gulf ended as of December 31, 2018. Consistent with applicable law, we provided Mr. Lis with a COBRA notification so he could continue the health benefits that had been provided to him as a term of his employment. Exhibit J.

## *Mr. Lis's Wrongdoing*

30.   As Mr. Lis's involvement in the business wound down, I discovered a number of things he had done to harm the business, as set forth below.

31.   First, I am informed that on or about April 25, 2018, Mr. Lis registered an entity known as JAL Environmental Services Programs, LLC in New York. Mr. Lis did this at the time he was employed by Gulf Premier to produce business for JAL, and at a time when he now claims he was a "partner" of JAL. He also did this with the apparent intent that he would create an entity that others in the market place would confuse with the Texas JAL owned by me, and with an equally clear intent to divert opportunities to his new company. A copy of his registration is attached as Exhibit K. Mr. Lis never informed myself of anyone else associated with JAL of his new entity.

32.   Indeed, Mr. Lis made use of his new entity even before he ended his employment with Gulf Premier. In November 2018, while still employed by Gulf Premier, Mr. Lis apparently directed U.S. Ecology to conduct business with his new, New York JAL entity. Invoices from U.S. Ecology include the EIN number of the New York LLC and the address of the New York City residential building that Mr. Lis was using to conduct business, and were signed by Mr. Lis. Copies of such invoices are attached as Exhibit L. Copies of earlier invoices, including the correct, Texas address of JAL and its EIN number are also attached as Exhibit M.

33.   Also notable is that while Mr. Lis never told me that he had set up a New York LLC called JAL, in the "Release" he presented in October, he included provisions specifically permitting the parties to pursue competing businesses, but specifically prohibiting the parties from doing business through the "Texas JAL." This was an obvious effort to deceive me and to assist Mr. Lis in his effort to steal JAL's business.

34. I also discovered that Mr. Lis forged my signature on the so-called "Sharing Agreement" relating to the lease of space in New York City. I never saw that document until this litigation, and never signed it. He likewise paid a broker a fee for finding residential space in lower Manhattan without my knowledge. In addition, he sent a letter to a New York real estate broker under my name that I never saw, read, or signed.

*Conclusion*

35. For the reasons set forth above, and in the accompanying Memorandum of Law, I respectfully request that Plaintiff's Motion be denied in its entirety.

Executed on: March 24, 2019

_____
Jason M. Lancaster